The relief described hereinbelow is SO ORDERED.

SIGNED this 2nd day of July, 2014.



_____
Robert D. Berger
United States Bankruptcy Judge
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:

**EXPERT SOUTH TULSA, LLC,**                                **Case No. 10-20982**
              **Debtor.**                                              **Chapter 11**

_____

**EXPERT SOUTH TULSA, LLC,**
              **Plaintiff,**

       **v.**                                              **Adv. No. 11-06208**

**E.H. HAWES REVOCABLE TRUST,**
              **Intervenor,**

       **v.**

**CORNERSTONE CREEK PARTNERS, LLC,**
              **Defendant.**

_____

### NUNC PRO TUNC
### MEMORANDUM OPINION AND ORDER GRANTING
### CORNERSTONE CREEK PARTNERS LLC'S
### MOTION FOR SUMMARY JUDGMENT

*14.07.02 Order NPT Granting Cornerstone's MSJ.wpd*

**Introduction**

This case comes before the Court on the Motion for Summary Judgment filed by Cornerstone Creek Partners, LLC (Cornerstone or Defendant)[1] and the objection to it filed by Plaintiff Expert South Tulsa, LLC, and Intervenor E.H. Hawes Revocable Trust.[2] Prior to the filing of this case, Debtor Expert South Tulsa, LLC (EST), sold real property (Memorial Commons) to Cornerstone. EST filed this adversary case to avoid the sale of Memorial Commons to Cornerstone, asserting claims under the Bankruptcy Code and the Oklahoma Uniform Fraudulent Transfer Act. EST's adversary complaint[3] requests relief under 11 U.S.C. §§ 544(b) and 548.[4] E.H. Hawes Revocable Trust (Trust) has been substituted for EST to protect the Trust's potential interest in a certain promissory note described below.[5]

**Jurisdiction**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). Reference to the Court of this proceeding is appropriate under 28 U.S.C. § 157(a) and Standing Order No. 13-1 of the United States District Court for the District of Kansas. This case is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

---

[1] Doc. 40.

[2] Doc. 78.

[3] Doc. 1.

[4] All future statutory references are to the Bankruptcy Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532, unless otherwise specifically noted.

[5] The Debtor/Plaintiff appears by its attorney, Jonathan A. Margolies of McDowell, Rice, Smith & Buchanan, Kansas City, MO; Intervenor E.H. Hawes Revocable Trust appears by its attorney, Eric L. Johnson of Spencer Fane Britt & Browne, LLP, Kansas City, MO; Defendant Cornerstone Creek, LLC, appears by its attorneys, John W. McClelland of Armstrong Teasdale, LLP, Kansas City, MO, and Sidney K. Swinson of GableGotwals, Tulsa, OK.

Pursuant to 28 U.S.C. § 157(c)(2), Cornerstone Creek Partners, LLC, Expert South Tulsa, and the Trust have consented to the Court hearing and determining this adversary proceeding and entering a final judgment with respect to the same; and the Court has jurisdiction to issue a final order in this adversary proceeding pursuant to 28 U.S.C. § 157(b) and/or 28 U.S.C. § 157(c)(2).

## Statement of Facts

On January 26, 2007, EST obtained a loan with Marshall & Ilsley Bank (M&I) for the purpose of developing 35 acres of real estate in Tulsa, Oklahoma. An approximately 21.5-acre parcel of this real estate, known as Memorial Commons, was eventually sold to Cornerstone and is the subject of the dispute in this case. The loan, which was renewed or modified on several occasions, was evidenced by an amended promissory note dated April 8, 2008 (Note),[6] and was secured by a purchase money mortgage, security agreement, assignment of rents and leases, and fixtures filing dated January 26, 2007 (Mortgage).[7] EST's principals, Lawrence V. McLellan II and Trey Hawes, guaranteed the Note on April 8, 2008.[8] On March 25, 2009, M&I assigned the Note, Mortgage, and related loan documents to OKL 18, LLC (OKL).[9] At the time of this assignment, EST was in default on the Note.[10] Shortly after OKL acquired the Note and Mortgage, EST and OKL entered into a forbearance agreement.[11] This forbearance agreement

---

[6] Doc. 100-1, Exhibit 1 to Affidavit of Edwin Hugh ('Trey") Hawes, III, Exhibit A to Plaintiff and Intervenor's Objection (Doc. 78) (hereafter Objection).

[7] Doc. 100-2, Exhibit 2 to Exhibit A to Objection.

[8] Doc. 100-3, Exhibit 3 to Exhibit A to Objection.

[9] Doc. 102-2, Exhibit E to Objection.

[10] Doc. 100, Exhibit A to Objection, ¶ 19, at 5.

[11] Doc. 100-11, Exhibit 11 to Exhibit A to Objection.

(First Forbearance Agreement) was signed on April 22, 2009, and granted EST until July 22, 2009, to make payments before OKL foreclosed on the property.[12]  The consideration paid to OKL for the First Forbearance Agreement was $500,000 (First Forbearance Fee).  The Trust paid $200,000 of this fee.[13]  The First Forbearance Agreement also contained a provision allowing EST to settle its liability with OKL upon payment of $5,000,000.[14]  On July 23, 2009, OKL and EST entered into a second forbearance agreement (Second Forbearance Agreement).[15]  The $100,000 fee paid to OKL for this agreement was paid by the Trust.[16]  The Second Forbearance Agreement provided that OKL would not attempt to collect against Memorial Commons until August 5, 2009, with an option to extend the forbearance period to August 20, 2009.  The fee to exercise the extension was $250,000; this fee was paid to OKL by Expert Development, a management company.  Expert Development's principals at the time were Lawrence McLellan and Trey Hawes.

Despite these agreements, OKL initiated foreclosure proceedings in Oklahoma on August 11, 2009 (Foreclosure Action).[17]  In the Foreclosure Action, OKL sought judgment *in*

---

[12] *Id.* ¶ 3, at 3-4.

[13] Doc. 100, Exhibit A to Objection, ¶ 23, at 6.

[14] Doc. 100-11, Exhibit 11 to Exhibit A to Objection, ¶¶ 4(b) and (c), at 4-5.

[15] Doc. 100-16, Exhibit 16 to Exhibit A of Objection.

[16] Doc. 100, Exhibit A to Objection, ¶ 31, at 8.

[17] *OKL 18, LLC v. Expert South Tulsa, LLC, et al.*, Case No. CJ-2009-05969 in the District Court of Tulsa County, Oklahoma.  Doc. 40 ¶ 2, at 3.  This case was consolidated with *Key Construction of Oklahoma, LLC v. Expert South Tulsa, LLC*, Case No. CJ-2009-3100. *Id.*  The *Key Construction* case was filed by the largest mechanic's lien holder against EST.  Any reference to the Foreclosure Action is to this consolidated case.

*personam* against EST as to the Note and *in rem* as to the Mortgage.[18]  On December 30, 2009, and while the Foreclosure Action was pending, OKL assigned its interest (Assignment) in the Note and Mortgage to GTMI, LLC (GTMI).  This Assignment was not recorded and GTMI was not substituted as a party in the Foreclosure Action.  On November 6, 2009, OKL filed a motion for default judgment in the Foreclosure Action.  EST did not respond to any of the pleadings filed in that case.

On November 9, 2009, OKL and the Trust signed an "Option to Purchase the Tulsa Note" (Option Agreement).[19]  The terms of the Option Agreement provided that the Trust could purchase the Note from OKL no later than December 31, 2009, for a payment of $1,645,108 plus certain per diem payments if payment were tendered after November 30, 2009.  The Option Agreement contained both a strict deadline[20] and a clause indicating that time is of the essence.[21]

During December 2009, EST negotiated with a potential buyer (Mike Sitton and his company, Sitton Properties, LLC) and with several creditors to sell Memorial Commons by the end of 2009.  When it became clear that a sale would not be completed before the Option Agreement deadline, Trey Hawes communicated this situation to Steve Perry, a member and manager of OKL.[22]  During the communications on December 29, 2009, Steve Perry indicated

---

[18] Doc. 40-4, Defendant's Exhibit 1 (Petition for Foreclosure) to Exhibit A (Declaration of Elizabeth R. Muratet, Doc. 40-2) to Motion for Summary Judgment (MSJ).  In the Foreclosure Action, the Mortgage was defined as "that certain Purchase Money Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing," and this Court adopts the same classification.

[19] Doc. 100-27, Exhibit 27 to Exhibit A to Objection.

[20] *Id.* ¶ 2, at 2.

[21] *Id.* ¶ 12, at 3.

[22] Doc. 100-32, Exhibit 32 to Exhibit A to Objection.

14.07.02 Order NPT Granting Cornerstone's MSJ.wpd  - 5 -

that the Option Agreement[23] could potentially be extended beyond the expiration date.

A contract to purchase Memorial Commons (Purchase Agreement) was eventually signed between EST and Cornerstone with the sale to close on January 8, 2010. The terms of the Purchase Agreement are listed in the Seller's Closing Statement.[24] Under the Purchase Agreement, Cornerstone paid $3,000,000, but only $261,477.00 of this amount went to EST.[25] The balance of the purchase price satisfied the claims of some of EST's other creditors.[26] Notably, $1,742,170.16 of the purchase price was paid to GTMI; $114,999.77 was distributed among various mechanic's lienholders; $415,000.00 was paid to the Trust; and $225,000.00 was paid to Expert Development.[27] The remaining funds were used to pay other costs arising from the sale.[28] Attendant to the closing, OKL and GTMI released their mortgage interests in Memorial Commons.[29] The Note, however, was never marked satisfied or paid in full, nor was anything done to the Note physically to indicate that the debt was released or satisfied. Also attendant to the sale closing, OKL voluntarily dismissed the Foreclosure Action with prejudice.[30]

---

[23] *Id.* at 2-3. The statements made in the email string are vague at best, but for purposes of this motion, the Court will infer that Perry is speaking about the Option Agreement.

[24] Docs. 40-11 and 40-12, Exhibit 8, parts 1 and 2, to Exhibit A to MSJ.

[25] Doc. 40-11, Exhibit 8, part 1, to Exhibit A to MSJ.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Doc. 40-24, Exhibit 3 to Exhibit B (Declaration of Pam Bewley) to MSJ; Doc. 102-23, Exhibit Z to Objection.

[30] Doc. 40-13, Exhibit 9 to Exhibit A to MSJ, at 5.

Finally, the mechanic's lien claimants[31] released their liens in Memorial Commons and settled their claims against EST.[32]  No one disputes that at closing Cornerstone obtained clear title to Memorial Commons.

Shortly after the sale closed, Hawes asked GTMI for an assignment of the Note to the Trust.[33]  GTMI indicated that it was not sure whether any obligation on the Note continued once the Foreclosure Action was dismissed with prejudice.[34]  Nonetheless, in April 2010, GTMI assigned the Note, without representation or warranty, to the Trust, back-dated to January 8, 2010.[35]

On January 19, 2010, eleven days after the sale closed, Cornerstone sold Memorial Commons to South Memorial Development, LLC (South Memorial) for $4,421,230.  As a result of the sale to South Memorial, Cornerstone allegedly earned a profit of $1,421,230.

On March 30, 2010, EST was placed in involuntary chapter 7 bankruptcy by one of its creditors.  The case was then converted to chapter 11 on May 7, 2010.  This adversary proceeding was filed by EST on September 1, 2011, to recover $1,421,230.00 from Cornerstone

---

[31] The mechanic's lienholders were: Key Construction Oklahoma, LLC; Messer Construction, Inc.; MSB Construction Co.; Circle Services Construction; Pave Stone Store of Oklahoma; Utility Supply Co., Inc.; and Liberty Precast, LLC.  These companies were all joined in the *Key Construction* case noted in footnote 17, *supra*.  These companies are collectively referred to as the mechanic's lien claimants or mechanic's lienholders.

[32] Key Construction's foreclosure action was dismissed with prejudice when the dismissal was filed in the Foreclosure Action.  At the same time, the mechanic's lienholders all filed releases of their mechanic's liens and disclaimers disavowing any right, title, or interest in Memorial Commons.

[33] Doc. 100-39, Exhibit 39 to Objection.

[34] *Id.*

[35] Doc. 40-31, Exhibit I to MSJ.

under either 11 U.S.C. §§ 548 or 544(b) of the Bankruptcy Code.[36]  Cornerstone filed the instant

Motion for Summary Judgment; the Hawes Trust is the intervenor[37] and is a party-in-interest.

## Summary Judgment Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law.[38]  To determine

whether a genuine dispute as to a material fact exists, all justifiable inferences must be drawn in

favor of the non-moving party.[39]  Summary judgment is appropriate if the non-moving party

"fails to make a showing sufficient to establish the existence of an element essential to that

party's case."[40]

Since Cornerstone is the movant, all justifiable inferences from the evidence in the record

will be drawn in favor of EST and the Trust.  Cornerstone must demonstrate that no genuine

issue as to any material fact exists and that it is entitled to judgment as a matter of law.

## Discussion

There are two independent claims against Cornerstone.  The first claim arises under

§ 544(b); the second arises under § 548.  Under § 544(b), the Court looks to state law causes of

action, here the Uniform Fraudulent Transfer Act of Oklahoma.  Under § 548, the Court looks to

whether the sale was a constructively fraudulent transfer under the Code.  Cornerstone

---

[36] Doc. 1, Complaint, at 4-6.

[37] Doc. 61.

[38] Fed. R. Civ. P. 56(a) and Fed. R. Bankr. P. 7056.

[39] *Magnus, Inc. v. Diamond State Ins. Co.*, 545 Fed. App'x 750, 752 (10th Cir. 2013) (citation omitted).

[40] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

challenges both the UFTA claim and the § 548 claim on the grounds that the transfer of fully encumbered property does not satisfy the definition of an "asset" or "an interest of the debtor in property." Second, Cornerstone challenges the claim that EST did not receive reasonably equivalent value because, according to Cornerstone, the consideration EST received was equal to or greater than the fair market value of the property. The Court considers each argument in turn and reaches the following conclusions.

**A. The Trust may not avoid the sale of Memorial Commons under § 544(b) because the sale did not constitute a fraudulent transfer under the UFTA as adopted by Oklahoma.**

"Section 544(b) of the Bankruptcy Code permits the Trustee to stand in the shoes of a creditor to assert any state law claims that a creditor may have."[41] According to § 544(b), "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." To establish a claim under this statute, the Trustee, or in this case, the Debtor-in-possession, must establish liability under applicable state law.[42]

Here, the applicable state law is the law of Oklahoma.[43] Oklahoma has adopted the Uniform Fraudulent Transfer Act (UFTA).[44] The UFTA provides:

---

[41] *Kupetz v. Wolf*, 845 F.2d 842, 845 (9th Cir. 1988).

[42] *Georgia-Pacific Corp. v. Lumber Prods. Co.*, 590 P.2d 661, 666 (Okla. 1979) (Creditor asserting the applicability of Oklahoma UFTA has the burden of proof.).

[43] *See Brenner v. Oppenheimer & Co. Inc.*, 273 Kan. 525, 539 (Kan. 2002). "Where the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement." Here, the parties chose to have Oklahoma law control.

[44] The Oklahoma UFTA provisions are codified in OKLA. STAT. ANN. 24 §§ 112-123.

14.07.02 Order NPT Granting Cornerstone's MSJ.wpd  - 9 -

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[45]

A transfer is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with *an asset or an interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance."[46] An asset is property of the debtor, excluding property "to the extent it is encumbered by a valid lien . . . ."[47] According to Cornerstone, the plain reading of the UFTA suggests that when property is fully encumbered by a valid lien, it is no longer an asset of the debtor, and therefore a transfer of fully encumbered property is not fraudulent under the UFTA.

Oklahoma does not appear to have any case authority on this issue, and the parties cite to none, so this Court will look to other jurisdictions that have interpreted the same or similar provisions. The general rule under the UFTA is that a debtor must have equity in property before it can be considered an asset.[48] If Memorial Commons were fully encumbered at the time it was sold to Cornerstone, the transfer was not fraudulent under the UFTA.[49] The Trust asserts

---

[45] OKLA. STAT. ANN. 24 § 117(A).

[46] OKLA. STAT. ANN. 24 § 113(12) (emphasis added).

[47] OKLA. STAT. ANN. 24 § 113(2)(a).

[48] *See e.g., In re Brun*, 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007); *Nat'l Loan Investors, L.P. v. World Prop., LLC*, 830 A.2d 1178, 1183 (Conn. App. Ct. 2003); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d. 821, 837 (N.D. Iowa 2004); and *Kellstrom Bros. Painting v. The Carriage Works, Inc.*, 844 P.2d 221, 222 (Or. Ct. App. 1992).

[49] *See* 5 COLLIER ON BANKRUPTCY ¶ 548.02[2][b], at 548-36 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2013). "[T]he UFTA does not permit creditors to set aside a transaction if the transfer was of property overencumbered by valid liens or of otherwise exempt or immune property."

that property ceases to be fully encumbered when a lienholder agrees to release its lien for less than full value of the collateral. The determination of whether the property was fully encumbered is made at the time of the transfer.[50]

The Trust points to *World Properties* to support its position. In *World Properties*, the Connecticut Court of Appeals was asked to overturn the trial court's finding that the defendants violated the UFTA. The defendants in that case were a husband and wife, along with the multiple shell companies they used to shelter money and assets from their creditors. The defendants frequently assigned property and funneled profits between the different corporations for no consideration. One of these transfers included property fully encumbered by a $17 million judgment lien on property valued at $14.5 million. The defendants argued that the transfer of the property from one corporation to another was not fraudulent under the UFTA because it was not an asset. The court disagreed with that position and determined that a prior agreement between the judgment lien creditor and the defendant corporation to settle the debt for $5.2 million limited the value of the lien to the compromised amount.[51] The court held that because the agreement occurred prior to the transfer, the settlement "fully discharged the $17 million lien and substituted the $5.2 million lien in its stead."[52] Because the new lien was below the market value of the property, the court determined that the property was an asset of the debtor and therefore the UFTA applied. The Trust argues the same principle applies here. According to the Trust, GTMI agreed to release its lien upon payment of the approximately

---

[50] *World Properties*, 830 A.2d at 1183.

[51] *Id.*

[52] *Id.*

$1,700,000 Option Price, thereby limiting the lien to that amount.  At the sale closing, EST owed close to $8 million on the Note and the property was worth no more than $4,990,000.[53]

The facts in *World Properties* are distinguishable from those here because at the time of the Memorial Commons' sale, there was no prior agreement in place that limited OKL's ability to enforce the entire amount of the Note against EST.  The Option Agreement was between OKL and the Trust, and it provided that the Trust could purchase the Note and Mortgage from OKL for a price below Memorial Commons' market value.  If the Trust had purchased the Option, the Trust would have then been able to enforce the entire amount of the Note against EST, which is exactly what the Trust is attempting to do in this adversary case.  The Option Agreement did not limit the value of the lien against EST.  The Trust similarly cannot point to the Forbearance Agreements as evidence that the value of the lien was reduced because those agreements were temporary and OKL was legally entitled to enforce the full value of the lien upon the expiration of those agreements.

EST secured the release of the Note and Mortgage upon payment of a portion of the sale proceeds to GTMI.  This occurred concurrently with the transfer of Memorial Commons to Cornerstone, not prior to the transfer as in *World Properties*.  For UFTA purposes, the transfer of Memorial Commons to Cornerstone was not a transfer of an asset.  However, even if the result of the agreement were that Memorial Commons became an asset of the debtor, the discussion below explains why EST received reasonably equivalent value for the property.

**B.      The Trust may not avoid the sale under § 548 because EST received reasonably equivalent value when it sold Memorial Commons to Cornerstone.**

---

[53]  Doc. 78 ¶ 100, at 28-29 (stating that an appraisal less than a month after the sale valued Memorial Commons at $4,990,000).

Section 548 of the Code allows the trustee, or in chapter 11 cases, the debtor-in-possession,[54] to avoid fraudulent transfers made within two years of the petition date. Specifically, § 548(a)(1) states:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the petition, if the debtor voluntarily or involuntarily –
> (A)   made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, incurred or indebted; or
> (B)   (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>       (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>           (II) was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital . . . .

Cornerstone argues that the sale of Memorial Commons was not a fraudulent transfer because it was not a transfer "of an interest of the debtor in property" and that even if it were, the Debtor received "reasonably equivalent value."[55]

### 1.      Under Oklahoma law, Debtor had an interest in Memorial Commons.

What constitutes "an interest of the debtor in property" is not defined in the Bankruptcy Code in the same way that asset is defined in the Oklahoma UFTA.  Without a clear definition, Cornerstone asserts that the UFTA analysis applies to § 548 and therefore fully encumbered property cannot be fraudulently transferred.[56]  The Court disagrees.  The Supreme Court has stated that "property of the debtor subject to the preferential transfer provision is best understood

---

[54] 11 U.S.C. § 1107(a).

[55] No claim has been asserted that the transfer was made with fraudulent intent under § 548(a)(1).

[56] Cornerstone cites *In re Solomon*, 300 B.R. 57, 63 (Bankr. N.D. Okla. 2003), to support its position that the UFTA and § 548 "are *in pari materia*," but in *Solomon*, neither party questioned whether the debtor had an interest in the property, so the court did not consider the issue.

as that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings."[57]  Property of the estate includes fully encumbered property.[58]  Cornerstone correctly asserts that the extent of a debtor's interest in the property is determined by state law.[59]  The applicable Oklahoma law that determines the Debtor's rights in encumbered real property is not the UFTA, however.  In Oklahoma, a mortgagor retains "all incidents of ownership," including the right to possession, the right to collect rents, and the right to hold title.[60]

EST retained all incidents of ownership as a mortgagor under Oklahoma law.  These rights gave EST a sufficient interest in the property such that Memorial Commons would have been property of the estate had EST not sold the property to Cornerstone.  This interest is therefore sufficient to satisfy the first prong of the § 548 analysis.

The Trust argues that Memorial Commons was not fully encumbered at the time it was sold because GTMI contractually limited its interest in the loan to the amount of the Option Price.  Since the amount of equity in Memorial Commons that EST possessed at the time of the transfer is not necessary to determine whether EST had an interest in the property, the impact of

---

[57] *Begier v. Internal Revenue Service*, 496 U.S. 53, 58-59 (1990) (internal quotation marks omitted).

[58] *See* §§ 362(d)(2)(A), 506(a)(1), and 541(b); *see also In re Equator Corp.*, 2007 WL 3119679, at *2 (Bankr. S.D. Tex.) ("The fact that property is fully encumbered, or even over-encumbered, does not exclude the property from the definition of property of the estate . . . ."); In *re Kasper*, 309 B.R. 82, 98 (Bankr. D.C. 2004) (citing *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198 (1983)).

[59] *Barnhill v. Johnson*, 503 U.S. 393, 397 (1992) (citation omitted); *see also Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.").

[60] *Teachers Ins. and Annuity Ass'n of America v. Oklahoma Tower Assocs. Ltd. P'ship*, 798 P.2d 618, 619-20 (Okla. 1990).  *See also Butner*, 440 U.S. at 52-54 (discussing generally the difference between "lien" and "title" theory states).

14.07.02 Order NPT Granting Cornerstone's MSJ.wpd - 14 -

the Option Agreement is more applicable to whether EST received reasonably equivalent value.

> **2.** **Expert South Tulsa received reasonably equivalent value for the sale of Memorial Commons.**

Section 548 of the Bankruptcy Code allows trustees to avoid constructively fraudulent transfers. Constructively fraudulent transfers are those transfers in which the debtor did not necessarily transfer the property with any fraudulent intent, but which the Code deems to unfairly diminish a debtor's assets to the creditor's detriment.[61] For a court to find that a transfer was constructively fraudulent under this section, it must find that the debtor did not receive "reasonably equivalent value."[62] "The plaintiff seeking to set aside a transaction has the burden of proving a lack of reasonably equivalent value."[63]

Although "reasonably equivalent value" is not defined in the Code, courts have developed a two-part test to determine whether it exists on a case-by-case basis.[64] The first part of the test looks to whether the debtor received any value in exchange for the property.[65] This step is usually only examined when it is unclear what exactly was received in exchange for the asset transferred. If a court determines that value was received in exchange for the asset transferred, then the next step is to determine whether that value was "reasonably equivalent" to the value of the asset transferred.[66] Here, both parts of the test are contested, and therefore the

---

[61] 5 COLLIER ON BANKRUPTCY ¶ 548.05, at 548-67, *supra* note 49.

[62] 11 U.S.C. § 548(a)(1)(B)(i).

[63] *Kipperman v. Onex Corp.*, 411 B.R. 805, 837 (Bankr. N.D. Ga. 2009).

[64] 5 COLLIER ON BANKRUPTCY ¶ 548.05[2][a], at 548-68, *supra* note 49.

[65] *Id.*

[66] *Sender v. Buchanan (In re Hedged-Investments Assocs., Inc.)*, 84 F.3d 1286, 1289 (10th Cir. 1996).

14.07.02 Order NPT Granting Cornerstone's MSJ.wpd - 15 -

Court looks at each one in turn.

The Code defines value under § 548(d)(2)(A) as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ."  As the definition suggests, courts may consider more than the dollar value provided from the purchaser in an alleged fraudulent transfer.[67]  It has been noted that "in deciding whether value has been transferred the court must examine 'all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect.'"[68] Value can include satisfaction of antecedent debt of the debtor, but it does not normally include the satisfaction of another party's debt.[69]  Value can include indirect benefits to the estate when these benefits result from the transaction.[70]

Here, the transfer of Memorial Commons from EST to Cornerstone encompassed more than the $3 million purchase price.  It is evident from the closing documents that the release of the mortgages, the dismissal with prejudice of the Foreclosure Action, and the release of the mechanic's liens were tied to, and consideration for, the sale of Memorial Commons to Cornerstone.  These concessions, provided by OKL, GTMI, and the mechanic's lien claimants, were made in accordance with the sale, and the only reason they are questioned now is because

---

[67] *See Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001) (Courts must consider all the factors bearing on the sale.).

[68] *Id.*, quoting *Christians v. Crystal Evangelical Free Church (In re Young)*, 82 F.3d 1407, 1415, *vacated*, 521 U.S. 1114 (1997), *reinstated*, 141 F.3d 854 (8th Cir.1998), *cert. denied*, 525 U.S. 811 (1998).

[69] *In re Richards & Conover Steel, Co.*, 267 B.R. at 613.

[70] *See, e.g.*, *Kipperman v. Onex Corp.*, 411 B.R. 805, 837-38 (Bankr. N.D. Ga. 2009) (stating that "courts must look beyond the actual money received to the indirect benefits to the debtor." The court also included "synergistic effects of new corporate relationships, the arrival of a new, more successful management team, tax benefits, additional access to credit to facilitate new business opportunities, and the ability to protect a source of supply or customer relationships" in the list of benefits potentially received by a debtor in a leveraged buyout context.).

the Trust wishes to enforce the Note.

Before turning to the Note, the Court finds that the release of the Mortgage by OKL and GTMI and the release of the mechanic's liens fall under the definition of "value" and therefore must be included as value to EST. The evidence shows that the mortgages were to be released simultaneously with the closing of the sale and the closing was contingent on their release. This is also true for the mechanic's liens. The mechanic's lienholders consented to the release of their liens and debt upon payment of a portion of the purchase price. These actions were all taken in accordance with the Purchase Agreement and must be included in the analysis because they each provided value to EST. Ignoring these benefits to EST simply because they did not come directly from Cornerstone would be unjust and would not accurately reflect the significance of the transaction. That is, although Cornerstone obviously did not release liens or satisfy debt at closing, this occurred because of the sale to Cornerstone and the consideration paid by Cornerstone. The benefit of this bargain must be included as value to EST.

Turning now to the Note, this Court must determine whether it remains enforceable after the Foreclosure Action was dismissed with prejudice. The Trust provides the following evidence that the Note remains enforceable: (1) The Note was assigned to GTMI prior to the dismissal with prejudice; (2) Both OKL and GTMI signed a release of their mortgage interest but did not sign a release of the Note; (3) GTMI allegedly "acknowledged its responsibility with respect to the assignment of the Tulsa Note to the Trust;"[71] (4) GTMI assigned the Note to the Trust in April 2010, but made it effective to January 8, 2010; and (5) The original Note was not stamped "released," "forgiven" or "satisfied."

---

[71] Doc. 78 ¶ 88, at 26.

For purposes of this Motion, the Court finds that GTMI did in fact assign the Note to the Trust. The issue, however, is whether EST continued to have any obligation under the Note after the dismissal with prejudice was filed in the Foreclosure Action. The Trust asserts that the assignment of the Note to GTMI, who was not a party to the Foreclosure Action, preserved the obligation despite the filing of the dismissal. Cornerstone's position is that the dismissal with prejudice ended all rights to enforce either the Mortgage or the Note, and the principle of *res judicata* prevents any action to collect on the loan.

Resolving this issue requires a determination of answers to two questions: Was the assignment of the Note from OKL to GTMI prior to the dismissal with prejudice of the Foreclosure Action effective to terminate the state court's ability to adjudicate the dispute until GTMI was added as a party, and if not, was the dismissal with prejudice a final adjudication of the Foreclosure Action on its merits? The Court determines that the dismissal with prejudice of the Foreclosure Action terminated any right to enforce the Note and the Mortgage and that the dismissal was sufficient to serve as *res judicata* as to the Trust's claim to enforce the Note.

> The general principles of *res judicata* and estoppel by judgment have been clearly blueprinted. It is the rule of long standing and frequent repetition that where a second suit between the same parties, or their privies, is on the same cause of action, the final judgment in the prior action is conclusive as to all matters which were actually litigated and as to every issue, claim, or defense which might have been presented; and that where a later suit is upon a different cause of action, the judgment in the former operates as an estoppel only in respect to the issues and questions which were actually litigated and determined.[72]

*Res judicata* "is designed to ensure the finality of judicial decisions."[73] A stipulated, voluntary

---

[72] *Providential Dev. Co. v. U.S. Steel Co.*, 236 F.2d 277, 280 (10th Cir. 1956).

[73] *Clark v. Haas Group, Inc.*, 953 F.2d 1235, 1237 (10th Cir. 1992).

dismissal, approved by the court with prejudice, is a judgment on the merits.[74]

Here, the dismissal of the Foreclosure Action was agreed to by all the parties to the lawsuit and it was approved by the state court. Therefore, it was a judgment on the merits. Moreover, OKL and EST were the parties to the Foreclosure Action. GTMI was the assignee of the Note from OKL and was therefore in privity with OKL. Any decision in the Foreclosure Action was equally effective as to GTMI because the assignment occurred while the lawsuit was pending, and therefore GTMI was bound by the state court's decision. EST was the other party to the lawsuit, and EST is the plaintiff in this case even though the Trust is arguing the case as the intervenor. However, even if this were a separate lawsuit and the Trust were attempting to enforce the Note as the holder, the dismissal of the Foreclosure Action with prejudice would bar the Trust's claim.

The Trust also claims that the backdated assignment from GTMI was effective from January 8, 2010. However, as the assignee of GTMI, who was the assignee of OKL, the Trust was also bound by the outcome of the Foreclosure Action. As a result, the Note obtained by the Trust was unenforceable once the dismissal was filed.

The second step in the § 548 analysis is to determine whether the value received by EST was "reasonably equivalent" to the value of Memorial Commons. A determination of reasonably equivalent value looks to the value received by the debtor in comparison to the value of the assets transferred.[75] "Reasonably equivalent value" means "'approximately equivalent' or "roughly equivalent," and in voluntary transactions it means something "similar to fair market

---

[74] *Id.* at 1238.

[75] *See In re Richards & Conover Steel, Co.*, 267 B.R. at 612.

value."[76]   Cornerstone sold Memorial Commons on the open market for $4,400,000 shortly after acquiring it from EST.  The Trust presents evidence that the fair market value of Memorial Commons at the time of the transfer was at least $4,400,000, but suggests that it may have been worth $4,990,000.  The Court finds that the value received by EST in exchange for Memorial Commons included the release of the mechanic's liens valued at $499,740.29[77] and the release of the Note and Mortgage valued at $7,754,151.00.[78]  If all of the value received by EST is considered, the total amount EST received was significantly more than the appraisal value of $4,990,000.  Therefore, the Court determines that EST received reasonably equivalent value when it transferred Memorial Commons.

## Conclusion

Summary judgment is granted in favor of Cornerstone because the Trust cannot show any genuine issue of material fact precluding judgment in favor of Cornerstone.  Interpreting the evidence in the light most favorable to the Trust fails to show that a reasonable finder of fact could reach a holding in favor of the Trust.  The Trust cannot succeed on its § 544(b) claim because the transfer of fully encumbered property is not subject to Oklahoma's Uniform Fraudulent Transfer Act.  The Trust cannot succeed on its § 548 claim because EST received reasonably equivalent value for the sale of Memorial Commons.  For the reasons set forth above, Cornerstone's Motion is GRANTED.

A judgment based on this ruling will be entered on a separate document as required by

---

[76] *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540 n.4, 545 (1994) (internal quotation marks omitted).

[77] Doc. 40-2, Exhibit A to MSJ, ¶ 4, at 2.

[78] *Id.*

Federal Rules of Bankruptcy Procedure 7058, 9021, and Federal of Civil Procedure 58.

     IT IS SO ORDERED.

###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS